## AFFIDAVIT OF SHAWN W. ROGERS

I, Shawn W. Rogers, a Special Agent with the Drug Enforcement Administration

("DEA"), being duly sworn, depose and state as follows:

### INTRODUCTION

1.       This Affidavit is made in support of a complaint for civil forfeiture of the

following properties:

A) $640,754.79 SEIZED FROM DAVID BRUCE COFFEY, CITIZENS FIRST BANK CHECKING ACCOUNT # XXX463;

B) 2014 MERCEDES-BENZ GL450, VIN 4JGDF7CE4EA286609, SEIZED FROM DAVID BRUCE COFFEY AND CHARLSEY RENEE COFFEY;

C) 2014 MERCEDES-BENZ GL450, VIN 4JGDF7CE6EA306150,SEIZED FROM DAVID BRUCE COFFEY AND CHARLSEY RENEE COFFEY;

D) $9,150.00 IN UNITED STATES CURRENCY SEIZED FROM DAVID BRUCE COFFEY;

E) $100,296.83 SEIZED FROM DAVID BRUCE COFFEY, CITIZENS FIRST BANK CHECKING ACCOUNT # XXX679;

F) $256.20 SEIZED FROM DAVID BRUCE COFFEY AND CHARLSEY RENEE COFFEY, CITIZENS FIRST BANK CHECKING ACCOUNT # XXX378;

G) $40,396.75 IN UNITED STATES CURRENCY SEIZED FROM COFFEY FAMILY MEDICAL CLINIC;

H) $168,991.67 AND $322,350.70 SEIZED FROM COFFEY FAMILY MEDICAL CLINIC, CITIZENS FIRST BANK CHECKING ACCOUNT # XXX449;

I) $26,901.33 SEIZED FROM COFFEY FAMILY MEDICAL CLINIC, REGIONS BANK CHECKING ACCOUNT # XXX840;

J) $37,008.97 AND $2,328.37 SEIZED FROM MARK'S FAMILY PHARMACY, CITIZENS FIRST BANK CHECKING ACCOUNT # XXX813;

K) $164,567.04 AND $25,960.93 SEIZED FROM MARK'S FAMILY

PHARMACY, CITIZENS FIRST BANK DEPOSIT ACCOUNT # XXX355;

L) $48,913.46 SEIZED FROM BRANDON L. COFFEY AND LAUREN A. COFFEY, CITIZENS FIRST BANK CHECKING ACCOUNT # XXX535; and

M) $48,191.16 AND $795.16 SEIZED FROM LIFE CHOICES WELLNESS, FIRST NATIONAL BANK CHECKING ACCOUNT # XXX687.

2.     The above-identified properties (1) are proceeds of or facilitated the distribution of controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846 and (2) represent proceeds of or were involved in money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

3.     This Affidavit sets forth the factual basis for civil forfeiture of certain properties, but does not attempt to detail all of the evidence uncovered in the broader investigation of Coffey Family Medical Clinic (CFMC) and related individuals.

## AGENT BACKGROUND

4.     I am a Special Agent ("SA") with the Department of Justice, DEA, assigned to the London, Kentucky, Resident Office. I have been a Special Agent since August 2015 and am empowered by law to conduct criminal investigations. My duties since joining DEA have consisted of investigating Drug Trafficking Organizations ("DTO"), illegitimate medical practices, as well as related criminal acts, such as money laundering, fraud, and firearms offenses. I have received training from DEA regarding the investigation of such offenses and have participated in investigations involving the distribution of cocaine, methamphetamine, heroin, pharmaceuticals, and numerous controlled substances.

5.     Prior to my employment with DEA, I was employed as a Correctional

Officer with the Bureau of Prisons ("BOP") for approximately five years. During my employment with BOP, I participated in investigations of the trafficking of controlled substances such as marijuana, heroin, and cocaine, inside a correctional institution. I have received training in criminal law, constitutional law, rules of evidence, and identifying the techniques in which criminal organizations exploit security measures.

6.      During my employment with DEA, I have engaged in or contributed to investigations involving the seizure of controlled substances, as well as the seizure of evidence that document a criminal organization's activities in the manufacture, possession, and distribution of controlled substances. Through these investigations, my training and experience, and conversations with other experienced agents and law enforcement personnel, I have become familiar with the methods used by traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder related drug proceeds. Additionally, I am aware of the tactics utilized by physicians involving the improperly prescribing of controlled substances.

7.      My knowledge of these tactics includes but is not limited to the following:

a.      In the operation of a diverted pharmaceutical distribution system, the pharmaceuticals are produced legally in the United States and foreign countries and are first sold to wholesale distributors in the United States. The wholesale distributors then resell the pharmaceuticals to pharmacies who dispense them to persons who are prescribed the medication by a licensed practitioner. Although the pharmaceuticals are sometimes diverted by theft, the majority are diverted through illegal acts on the part of practitioners and/or the person to whom they are prescribed, or a combination of the two.

b. In cases involving the large-scale diversion of pharmaceuticals, unethical and illegal acts on the part of practitioners is essential. I am aware that these practitioners usually operate from behind the veil of a medical practice whose purpose purports to be the treatment of chronic pain, otherwise known as "pain clinics." These pain clinics usually, but not always, operate on a cash-only (or cash-equivalent, such as money orders and pre-paid debit cards) basis and do not accept insurance, Medicare, or Medicaid. Often persons with little or no medical experience own these clinics, either directly or through a silent-partner model, and employ unethical practitioners to further the enterprise. Additionally, pain clinics tend to accept, service, and, in many instances, cater to patients traveling from great distances (several states removed from the location of the pain clinic), in addition to serving local patients.

c. Pain clinics almost always require Magnetic Resonance Imaging ("MRI") as supporting documentation for each patient, but otherwise make little or no attempt to contact prior doctors of any patient in order to obtain any prior medical history and/or records. Pain clinics often conduct urinalysis drug screens or blood tests to determine if a patient has used any drug besides the prescribed medication. These tests tend to be cursory and can be easily tampered. Pain clinics that operate in this manner essentially offer only narcotic therapy—usually providing prescriptions of oxycodone in varying short-release formulations. Pain clinics typically do not offer physical therapy or other non-narcotic options for the treatment of pain and often document having counseled each patient on issues such as weight loss and smoking cessation, which counseling is, at best, cursory.

4

   d.  The operation of a pain clinic for the purpose of diverting pharmaceuticals, and ultimately for the profit of the owners, requires the practitioners to ignore certain indicators of potential diversion, i.e., "red flags," that competent and responsible practitioners, through their training and experience, would otherwise recognize. Through talking with law enforcement personnel involved in this investigation, knowledge of expert opinions gained in other investigations, and the admissions of practitioners prosecuted or investigated by the DEA, I have learned that these red flags include, but are not limited to the following:

- Patients who travel long distances, often from another state, to visit a particular doctor;

- Groups of people traveling together to visit the particular doctor;

- A single person paying for numerous people to see the doctor (i.e., use of a "sponsor");

- Patients requesting certain drugs or combinations of drugs;

- Inappropriate drug screens and pill counts; and

- Parking lot full of people waiting to get in to the pain clinic.

   8.  In addition, I have learned through my training, experience, and knowledge of previous federal cases that practitioners display certain "red flags" indicative of operating an illegitimate medical operation. These "red flags" include, but are not limited to the following:

- Widely prescribing large volumes of controlled substances;

- A cursory physical exam or no physical exam at all;

- Seeing a high patient volume;

- Physician or other clinic personnel "coaching" patients concerning symptoms, including level/extent of pain, related to the alleged malady;

- Physician or other clinic personnel directing patients to particular pharmacies for filling prescriptions;

- The issuance of prescriptions to individuals that exhibit signs that the patient is either delivering the drugs to others and/or abusing the drugs;

- Lack of bona fide treatment plan;

- Routinely prescribing combinations of controlled substances that pose a danger to patients;

- Controlled substances prescribed at intervals inconsistent with legitimate medical treatment; and

- No logical relationship between the drugs prescribed and treatment of the alleged condition.

9.      This Affidavit is based on information obtained through my own investigation of these matters as well as information provided to me by other federal, state, and local law enforcement officers who have participated in this investigation. I am familiar with all aspects of the investigation.

**LEGAL BACKGROUND**

10.      Pursuant to 21 U.S.C. § 841(a)(1), it is a criminal offense for any person to knowingly or intentionally distribute or dispense a controlled substances except as authorized by law. Controlled substances must be prescribed "for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). An order purporting to be a prescription that is not issued in the usual course of professional treatment is not a valid prescription. A

physician violates the authority to prescribe controlled substances pursuant to 21 U.S.C. § 841(a)(1), et seq., when the controlled substances is not being used for the treatment of a patient but rather for the purpose of assisting in the maintenance of a drug habit or the dispensing of controlled substances for other than a legitimate medical purpose. Pursuant to 21 C.F.R. § 1306.07(a), a practitioner may administer or dispense directly (but not prescribe) a narcotic drug listed in any schedule to a narcotic drug dependent person for the purpose of maintenance or detoxification treatment if the practitioner meets both the following conditions: (1) the practitioner is separately registered with DEA as a narcotic treatment program, and (2) the practitioner is in compliance with DEA regulations regarding treatment qualifications, security, records, and unsupervised use of the drugs pursuant to the Drug Abuse Prevention and Control Act, 21 U.S.C. § 801, et seq.

11.     21 C.F.R. § 306.04(a) provides: "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. § 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

12.     Relevant to the complaint, a person violates 18 U.S.C. § 1956 when he or she knowingly conducts a financial transaction with proceeds of a specified unlawful activity with specific intent to promote the unlawful activity; conceal or disguise the source, origin, nature, ownership, or control of the proceeds; evade reporting requirements; or evade taxes. A person violations 18 U.S.C. § 1957 when he or she engages or attempts to engage in a monetary transaction with the proceeds of a specified unlawful activity in an amount greater than $10,000, by, through, or to a financial institution, which is defined by 31 U.S.C. § 5312(a)(2) to include banks and "persons involved in real estate closings and settlements."

## BACKGROUND ON INVESTIGATION

13.     The DEA, Tennessee Bureau of Investigation ("TBI"), Pulaski County Sheriff's Office, and Lake Cumberland Drug Task Force, have identified a physician known to law enforcement as David Bruce Coffey, MD, hereinafter referred to as Bruce Coffey, facilitating the distribution of controlled substances to drug traffickers operating in southeastern Kentucky. Bruce Coffey operates CFMC with his sons Brandon Coffey, MD; and David Alex Coffey, MD, hereinafter referred to as Alex Coffey. Beginning in 2016, Daniel McCollum began operating CFMC in close coordination with Bruce Coffey. Additionally, law enforcement has identified Evelyn Faye Smith, NP; Colton Lowe, PA; and Dillon Gibson, PA, as practitioners who worked under the direction of Bruce Coffey. It is the belief of law enforcement that the aforementioned individuals have been involved in a conspiracy to dispense Schedule II and III controlled substances, and are ultimately responsible for millions of Schedule II controlled substances being

prescribed illegitimately to Kentucky and Tennessee patients.

14.     Additionally, I believe it is important to note for the purpose of references made throughout this Affidavit, that Bruce Coffey, Brandon Coffey, and Alex Coffey operate Suboxone clinics—that is, medical practices purporting to provide substance-abuse treatment in conjunction with prescribing buprenorphine (Suboxone)—in the Eastern District of Tennessee. These Suboxone clinics include Life Choices Wellness Clinic located in Oneida, Tennessee, operated by Brandon and Alex Coffey, and NUME Med Spa, operated by Bruce Coffey.

15.     Throughout this investigation, law enforcement has been made aware of Mark's Family Pharmacy, which is attached to CFMC. During undercover operations, law enforcement identified a sign inside CFMC that stated that David Bruce Coffey has a financial interest in Mark's Family Pharmacy. Financial records corroborated that the business was owned by David Bruce Coffey and Mark Byrd. Byrd is the pharmacist and his name appears on a sign posted on the front of the pharmacy.

16.     Law enforcement knows, both through direct observation and through records from Tennessee's prescription monitoring program ("PMP") to which pharmacists must report prescriptions they fill, that there are CFMC patients, including those from Kentucky, filling their CFMC controlled-substance prescriptions at Mark's Family Pharmacy. Based on interviews and a review of data concerning Mark's Family Pharmacy, law enforcement believes that many Kentucky patients filled prescriptions at Mark's Family Pharmacy because other pharmacies (including several in Kentucky) declined filling CFMC prescriptions and because filling the prescription at a Tennessee

pharmacy will not be reported to Kentucky's PMP, which is known as "KASPER" (Kentucky All- Schedule Prescription Electronic Reporting).

17.     Through this investigation, law enforcement has identified DTOs operating in the Pulaski County, McCreary County, and Russell County areas of southeastern Kentucky. These DTOs have diverted Schedule II and III pharmaceuticals primarily prescribed by Bruce Coffey and Brandon Coffey. The investigation has further determined that DTOs were using CFMC as their primary source of supply.

### Interviews with CFMC Staff

18.     This investigation has included numerous interviews of witnesses who have direct knowledge of the activities surrounding CFMC. These interviews include, but are not limited to, clinic staff, patients, known drug traffickers, and pharmacists who have directly interacted with CFMC. Law enforcement believes interviews obtained throughout this investigation have shown that CFMC operates to make money by writing illegitimate prescriptions to high volumes of patients while trying to maintain the appearance of a legitimate practice.

19.     Information obtained from CFMC staff, one of whom began working for Bruce Coffey in 2009, reported that Bruce Coffey provided pre-signed prescriptions for controlled substances for distribution to patients when he was not in the clinic. If the staff ran out of pre-signed prescriptions, a staff member would take blank prescriptions to Bruce Coffey at his farm, where the staff member observed him signing the prescriptions.

20.     One staff member who worked at CFMC and NUME Med Spa, a

Suboxone clinic, stated that Bruce Coffey gave specific instructions not to allow authorities to review patient records. If DEA came to the clinic when he was not there, they were instructed to call him and he would sneak in the back door. She also reported that nurses entered patient assessments into electronic medical charts and used Bruce Coffey's initials (DBC) as if the doctor made the entry.

21.     CFMC's office manager advised that it was not uncommon for CFMC to see approximately 200 patients a day. Through undercover visits, described below, investigators learned that cash paying patients were charged $250 for their initial visit to the clinic and $88 for subsequent visits.

22.     To corroborate information gleaned in the interviews of CFMC staff, I obtained information from four airlines and compared it to data obtained from Kentucky and Tennessee prescription monitoring programs and found that controlled substances were prescribed by Bruce Coffey, Alex Coffey, and Brandon Coffey on dates they had traveled outside of Tennessee.

23.     Two Kentucky pharmacists were interviewed during the investigation of CFMC. John Simkins, owner and operator of Somerset Pharmacy, had previously contacted DEA to report his concerns about Bruce Coffey's prescribing habits. Simkins received calls daily from people who want to get Bruce Coffey's prescriptions filled.  He only filled those prescriptions for his established customers. Simkins also reported that a prescription written by Brandon Coffey was presented to him and when he checked the DEA number, it belonged to Bruce Coffey, not Brandon.

24.     Dale Withers is a Pulaski County pharmacist who had previously contacted

law enforcement about Bruce Coffey's prescriptions. Coffey first came to his attention in approximately 2014-2015. Withers sometimes had to contact CFMC to obtain a diagnostic code on their prescriptions, and the code was usually chronic pain. Withers has overheard patients say they go to CFMC because other doctors will not give them what they want. Withers advised that red flags are raised by CFMC prescriptions because of the quantity of controlled substances prescribed and its practice of writing 14-day supplies.

25.    Current and former patients of CFMC were also interviewed in the course of this investigation. In August 2017, Oneida (Tennessee) Police conducted a traffic stop of Curtis Colyer, who stated he was on his way to an appointment with Bruce Coffey. He was in possession of more than 40 grams of crystal methamphetamine, an oxycodone tablet, and a bottle of urine. He stated that he has been seeing Bruce Coffey every two weeks for 10 years; he was receiving prescriptions for 56 oxycodone 15 mg pills and blood pressure medication at each visit.

26.    In December 2017, Carl Creech was interviewed after he was arrested for drug trafficking and a check of KASPER revealed that he was filling prescriptions for hydrocodone written by Bruce Coffey. Creech said that he had been a patient of Bruce Coffey for approximately 18 months, and he admitted that he has diverted some of the controlled substances prescribed by Coffey. He has never been subjected to a pill count at CFMC, and on at least one visit, he was informed that he failed a drug screen but he still received his prescription on that visit. Creech indicated that he has observed patients come to CFMC with other people's urine. Creech also stated that he has received a

prescription for a controlled substance signed by Bruce Coffey even though he was not seen by Bruce Coffey that day.

27.     In January 2018, investigators interviewed Michael Jackson, a former patient of Bruce Coffey and CFMC. Jackson had an extensive medical history, and on his first visit he told Bruce Coffey he had a hernia. Bruce Coffey did not inquire about his medical history, did not address his problem with the hernia, and prescribed pain medication and gabapentin, a medication used to prevent and control seizures and relieve nerve pain.

28.     In March 2018, I interviewed Teresa Couch and her husband, Hurlan Couch, both of whom reported being patients of Bruce Coffey. Teresa advised that Bruce Coffey told her that he does various procedures, e.g., X-rays, drug screens, and injections to "keep them [law enforcement] off my back." She also estimated that half the people going to CFMC were filling their prescriptions with Mark's Family Pharmacy.

29.     The patients interviewed also described that there were long lines of people and wait times at CFMC. They indicated that they had knowledge of medication prescribed by CFMC practitioners being diverted. The patients also noted that a number of the patients vising CFMC appeared to be from out of state based on seeing vehicles with tags from Kentucky and other states.

**Controlled Visits to Coffey Family Medical Clinic**

30.     Law enforcement has conducted approximately 10 undercover (UC) operations at CFMC. During this time, law enforcement has observed approximately 100

vehicles parked at CFMC, approximately six-hour wait times, hand-to-hand drug transactions, and suspected DTOs operating on the grounds of CFMC. On three separate occasions, law enforcement observed a suspected DTO leader (hereinafter, "DTO Leader") talking to three individuals in the CFMC parking lot while the clinic was operating. Based on further information described below, I believe that DTO Leader was instructing these individuals about getting prescriptions for controlled substances from CFMC.

31.    On August 3, 2017, TBI SA Chris Ramage, acting in an UC capacity, visited CFMC. SA Ramage overheard DTO Leader talking to several other patients about what to say to the doctor to receive their desired prescriptions. SA Ramage was seen by physician's assistant Colton Lowe. Lowe did not perform a physical examination and advised that CFMC has to do other forms of medicine (i.e., non-pharmacological) so the clinic does not look like a "pill-mill." He wrote a 14-day prescription for 56 hydrocodone 10 mg and 90 gabapentin 400 mg and further advised SA Ramage that CFMC almost never does pill counts.

32.    SA Ramage returned to CFMC for three more visits. On August 17, 2017, he waited seven hours to be seen by Brandon Coffey, who he saw for approximately 50 seconds, and was given a prescription for 56 hydrocodone 10 mg. While he waited, SA Ramage had a conversation with DTO Leader and he heard a woman tell DTO Leader that another patient "did his job, he's got the script, and he's at the window checking out." Subsequently, a man exited Mark's Family Pharmacy and handed DTO Leader a white prescription bag. SA Ramage observed other patients giving DTO Leader their

bags of prescriptions. On his third visit, he overheard DTO Leader discussing another patient who may not make her appointment that day, another indicator that he is involved in sponsoring patients. SA Ramage was seen by Bruce Coffey for about 20 seconds on his third visit, and by Brandon Coffey for 65 seconds on the fourth visit.  He received prescriptions for 56 hydrocodone 10 mg both visits.

### Prescription Monitoring

33.     Since the inception of this investigation, law enforcement has PMP records in Kentucky and Tennessee to track the number of controlled substances dispensed by Bruce Coffey. The PMP data indicate that Bruce Coffey prescribed more than **4,900,000 dosage units** of Schedule II controlled substances from January 2010 to March 2018.

34.     Based on previous training and experience involving distribution amounts of controlled substances, law enforcement believes these are inordinately high amounts of controlled substances dispensed by Bruce Coffey. This number does not include prescriptions written by other practitioners at CFMC.

35.     Of the total Schedule II controlled substances Bruce Coffey prescribed in this period, approximately 1,042,795 (21%) were prescribed to individuals with addresses in McCreary County, Kentucky. Based on search results from the U.S. Census website (http://www.census.gov), the 2010 census counted 18,306 residents of McCreary County, including children. From review of public sources, including Google search results, and discussion with local law enforcement, I know there are several family/general practitioners located in McCreary County.

**Mark's Family Pharmacy**

36.     A former CFMC patient who was interviewed for this investigation advised that Bruce Coffey told her she should fill her prescriptions at Marks's Family Pharmacy. Another Bruce Coffey patient, who was arrested for diverting his prescribed controlled substances, reported seeing patients giving away or selling their medication in the parking lot; he also reported waiting up to two hours to get his prescriptions filled at Mark's Family Pharmacy. Yet another former patient heard drug deals taking place outside CFMC. Byrd and his staff should have observed all of the "red flag" activities witnessed by SA Ramage on his UC visits and by the patients that were interviewed as part of this investigation.

37.     Records obtained from the Tennessee PMP for Mark's Family Pharmacy show instances of individuals, including Kentucky residents, who paid out of pocket, (noted in the records as "Private Pay") to fill one controlled substance prescription from CFMC, while a third-party provider (e.g., insurance or government program) was billed for another controlled substance prescription from CFMC on the same date. One example is a patient from Somerset, Kentucky who paid cash for alprazolam (a benzodiazepine known by its trade name Xanax), and used insurance to get hydrocodone, both prescribed by Bruce Coffey. I know from my training, experience, and consultation with medical experts that taking a benzodiazepine with an opioid presents significant risks to patients and would be likely a "red flag" for the third-party provider.

38.     Ordering data from pharmaceutical distributors is compiled and stored in

the Automated Reporting Consolidated Ordering System (ARCOS) maintained by DEA. Between 2013 and 2017, Mark's Family Pharmacy ordered approximately 1,632,400 dosage units of oxycodone. According to the Tennessee PMP records for the same period, approximately 43% of all oxycodone dispensed by Mark's Family Pharmacy was prescribed by Bruce Coffey alone.

39.     Information obtained from the ARCOS database indicates the national average, as well as the average by state, of oxycodone dispensed by pharmacies. Mark's Family Pharmacy's oxycodone distribution in 2016 was almost three times the state average, and four times the national average.

40.     In April 2016, Cardinal Health, a pharmaceutical distributor that supplied controlled substances to Mark's Family Pharmacy, conducted a site visit. The Investigator Site Report documents that Mark Byrd acknowledged his pharmacy dispenses a high percentage of controlled substances. He attributed that to the fact that he is located next to CFMC. Byrd also acknowledged that he sees a considerable number of Kentucky patients because Oneida is a border city with Kentucky. However, he also stated that he only fills controlled substance prescriptions for Kentucky patients that are written by Bruce Coffey, a fact controverted by Tennessee PMP records. Finally, the Cardinal Health investigator counseled Byrd to obtain access to Kentucky's PMP system so that he could properly vet Kentucky patients.

41.     Despite the Cardinal Health site visit, the Tennessee PMP data found no significant change in Mark's Family Pharmacy's practice of dispensing controlled substances to Kentucky patients. In fact, in 2017 its orders of oxycodone increased.

**Life Choices Wellness**

42.     Life Choices Wellness Clinic was a business operating as a substance-abuse treatment center. Brandon Coffey and Alex Coffey, both medical doctors authorized by DEA to prescribe buprenorphine, operated Life Choices. An investigation initiated by Tennessee Bureau of Investigation has resulted in evidence that Life Choices was unlawfully prescribing and/or dispensing buprenorphine, a Schedule III narcotic controlled substance for use in maintenance and detoxification treatment.

43.     The TBI investigators were contacted by DEA after it received complaints from pharmacists in Tennessee and Kentucky about the high volume of prescriptions for buprenorphine written by Brandon Coffee and Alex Coffey. Law enforcement in Kentucky has identified approximately 10 patients of Brandon Coffey who were diverting buprenorphine. A confidential source provided information to DEA that the source accompanied a friend on a visit to a Suboxone clinic in Oneida, Tennessee. KASPER records verified that the friend was a patient of Brandon Coffey. The CS stated that Life Choices prescribed buprenorphine without requiring counseling or drug testing; the friend exchanged urine with other individuals in case they were subjected to drug testing, and the friend paid cash for the visits to Life Choices.

44.     From September 2017 through May 2018, TBI and DEA conducted undercover operations at Life Choices. Two different undercover agents made visits to Life Choices posing as patients. During these visits, agents observed numerous red flags. For example, in September 2017, a TBI undercover agent went to Life Choices to enroll in the Suboxone program. He was advised that the fee for the initial visit was $120 with

18

three weekly follow-up visits for $90 each. If he was in compliance with office policies after four visits, he could come once a month for $330. The UC reported irregularities with the urine testing—it appeared as if specimens were collected but not tested in a timely manner. He was advised by Dr. James Robert Landon that Life Choices did not require proof of attending a drug treatment program because they worked on the honor system. Without performing a medical examination, Dr. Landon prescribed a one-week supply of Suboxone in the amount requested by the UC. After several pharmacies in Kentucky and Tennessee refused to fill the UC's prescription, a staff member at Life Choices directed him to a pharmacy in Anderson County, Tennessee—a 50-minute drive from Life Choices—that filled the prescription.

45.     The UC returned to Life Choices several times to obtain Suboxone. On some visits he was provided with an adulterated substance containing Suboxone to make it appear he was using his prescriptions. He was given prescriptions on each visit, despite the fact that he stated he was not attending counseling. On one occasion, Dr. Landon asked if he wanted to increase his dosage. On his fourth visit, the UC was told that his prescriptions could be called in for an additional fee and if he used a credit or debit card. On at least one visit, he was not seen by a doctor, he received a three-week supply of Suboxone for a fee of $270, a staff member told him that Dr. Landon was not there to sign a prescription, and she called it in to the pharmacy using the DEA information of Dr. Landon. Both UCs also saw Brandon Coffey at the clinic. He regularly gave them prescriptions for Suboxone without performing a medical evaluation, within one minute of seeing them, and without regard to drug screens.

46.     Investigators also performed surveillance of Life Choices and conducted interviews of a patient and another witness of activities at the clinic. Investigators observed numerous vehicles in the parking lot of the clinic with Kentucky tags and people waiting outside of the clinic. In their interviews, the witnesses indicated that Brandon Coffey does not conduct any physical examination and stops by the examination for less than a minute during visits. The witnesses expressed knowledge of diversion of controlled substances prescribed by Life Choices.

### Financial Analysis

47.     Financial records obtained from Citizens First Bank as part of this investigation show that David Bruce Coffey opened account number xxx449 in the name of Coffey Family Medical Clinic, P.C. using an address of P.O. Box 4729, Oneida, TN 37841. As of May 11, 2016, the authorized signors were Bruce Coffey, Charlsey Renee Coffey, and Daniel A. McCollum. The authorized signors have changed through the lifetime of the account; however, Bruce Coffey was the only consistent authorized signor since the opening of the account.

48.     Account records were reviewed from January 2012 through December 2017. During this period, deposits totaled over $22,000,000, which included at least $18,000,000 of payments from third-party providers (e.g., insurance companies or government insurance programs) and out-of-pocket patient payments. During this timeframe, checks and electronic transfers from the account included payments as summarized below:

| Payee | Approximate total disbursements from account xxx449 |
|---|---|
| Bruce Coffey | $1,500,000 |
| Charlsey Coffey | $85,000 |
| Electronic Transfers to Bruce and Charlsey Coffey's Account xxx378 | $1,000,000 |
| Electronic Transfers to Bruce and Charlsey Coffey's Account xxx458 | $100,000 |
| Brandon Coffey | $40,000 |
| Ashlee Coffey | $20,000 |

49.     A federal seizure warrant was served on Citizens First Bank account xxx449 in June 2018 and $168,991.67 and $322,350.70 was seized from this account.

50.     Financial records obtained from Regions Bank as part of this investigation show that account number xxx840 was opened in the name of Coffey Family Medical Clinic, P.C. using an address of 25 Airpark Ct, Greenville, South Carolina 29607.  The authorized signor was Daniel A. McCollum.

51.     Account records were reviewed from October 2016 through February 2018. During this period, deposits totaled over $6,000,000, which consisted of approximately $4,500,000 from Coffey Family Medical Clinic P.C., account number xxx449 at Citizens First Bank. During this same period, wire transfers totaling over $5,000,000 were made to Propel HR Inc. located in Greenville, South Carolina, which provides payroll and human resources services.

52.     A federal seizure warrant was served on Regions Bank account xxx840 in June 2018 and $26,901.33 was seized from this account.

53.     According to the records provided by Citizens First Bank, David Bruce Coffey also opened account number xxx378 using an address of P.O. Box 4729, Oneida, TN  37841.  As of January 1, 2014, the authorized signors were Bruce Coffey and Charlsey Renee Coffey.  The authorized signors have changed through the lifetime of the account; however, Bruce Coffey was the only consistent authorized signor since the opening of the account.

54.     Account records were reviewed from January 2012 through November 2017. During this period, total deposits exceed $9,000,000. These deposits include over $2,600,000 from CFMC accounts. Over $2,200,000 was deposited from Coffey Family Medical Clinic account number xxx449 at Citizens First Bank as detailed below:

| Estimated amount | Description of Deposit Source |
|---|---|
| $1,000,000 | Electronic Transfers from CFMC Account No. xxx449 |
| $1,200,000 | Checks payable to Bruce Coffey from CFMC Account No. xxx449 |
| $40,000 | Checks payable to Charlsey Coffey from CFMC Account No. xxx449 |

Total deposits also included the following:

| Estimated amount | Description of Deposit Source |
|---|---|
| $11,000 | Checks payable to Bruce Coffey from CFMC Account xxx840 at Regions Bank as referenced in paragraphs 50 and 51  above |
| $140,000 | Checks payable to Bruce Coffey from CFMC Account xxx347 at Regions Bank |
| $20,000 | Checks payable to Charlsey Coffey from CFMC Account xxx347 at Regions Bank |
| $200,000 | Electronic payroll deposits from "Coffey Family Me" |

| $1,000,000 | Checks payable to Bruce Coffey from Mark's Family Pharmacy |
|---|---|

Additionally, the records identified the following debits which indicate the purchase of assets:

| Check Number | Check Date | Check Payee | Check Amount |
|---|---|---|---|
| 8479 | Undated (cleared 10/15/15) | Global Motorsports | $17,179.16 |
| 1244 | November 2, 2015 | Ayers Escrow | $110,000.00 |
| 1273 | November 6, 2016 | CarMax | $18,862.36 |
| Cashier's Check No. 127361 | February 15, 2017 | Cashier's Check for Mercedes 450GL | $58,000.00 |
| 5098 | February 24, 2017 | CarMax *Memo: Charlsey's Car* | $16,478.26 |
| 1120 | April 26, 2017 | Premier Watersports | $33,425.86 |
| 1557 | August 26, 2017 | Cars Etc, II | $16,100.00 |
| 1528 | September 28, 2017 | Premier Watersports | $34,550.00 |

55.     A federal seizure warrant was served on Citizens First Bank account xxx378 in June 2018 and $256.20 was seized from this account.

56.     According to the records provided by Citizens First Bank, David Bruce Coffey also opened account number xxx458 using an address of P.O. Box 4729, Oneida, TN 37841. As of September 23, 2013, the authorized signors were Bruce Coffey and Charlsey Renee Coffey.

57.     Account records were reviewed from September 2013 through November 2017. During this period, total deposits exceed $5,000,000. Over $200,000 was deposited from Coffey Family Medical Clinic account number xxx449 at Citizens First Bank referred to in paragraphs 47 and 48 above as detailed below:

| Estimated amount | Description of Deposit Source |
|---|---|
| $100,000 | Electronic Transfers from CFMC Account No. xxx449, referenced in paragraphs 47 and 48 above |
| $100,000 | Checks payable to Bruce Coffey from CFMC Account xxx449 at First Citizens Bank as referenced in paragraphs 47 and 48 above |

Deposits also included approximately $270,000 from Mark's Family Pharmacy. Additionally, the records identified the following expenses which indicate the purchase of assets:

| Check Number | Check Date | Check Payee | Check Amount |
|---|---|---|---|
| 1010 | January 14, 2016 | Modern Auto **** (last portion Illegible) | $12,500.00 |
| Cashier's Check No. 125841 | November 30, 2016 | Crown Title | $32,164.96 |

58.     In addition to the federal seizure warrant served on Citizens First Bank account xxx378, a federal seizure warrant also was served on Citizens First Bank account xxx458 in June 2018. Evidence showed that payments from CFMC patients who received illegitimate prescriptions for controlled substances flowed into accounts xxx378 and xxx458. Upon execution of the warrants, law enforcement learned that approximately one month prior all of the funds in both accounts had been transferred to Citizens First Bank account xxx679 in the name of David B. Coffey.

59.     Records obtained from Citizens First Bank as part of this investigation show that on May 14, 2018, Coffey transferred $84,494.43 from xxx378 and $611,872.51 from xxx458 to account xxx679. On June 11, 2018, Coffey transferred

$934,498.69 from xxx679 into his savings account xxx463.

60.     Federal seizure warrants were served on Citizens First Bank accounts xxx679 and xxx463 in June 2018. $100,296.83 was seized from account xxx679 and $640,754.79 was seized from account xxx463.

61.     According to the records provided by Citizens First Bank, Brandon Lucas Coffey and Lauren Ashlee Coffey opened account number xxx535 using an address of ██████████████████████████████. In April 2017, the account address changed to ███████████████████████. Brandon and Lauren Ashlee Coffey are the only authorized signors.

62.     Account records were reviewed from January 2012 through December 2017. During this period, total deposits exceed $2,500,000. These deposits include over $40,000 in checks from Coffey Family Medical Clinic account number xxx449 at Citizens First Bank referenced in paragraph 47 and 48 above as detailed below:

| Estimated amount | Description of Deposit Source |
|---|---|
| $25,000 | Checks payable to Brandon Coffey from CFMC Account No. xxx449, including a single check for $15,000 |
| $20,000 | Checks payable to Ashlee Coffey from CFMC Account No. xxx449 |

Total deposits also included the following:

| Estimated amount | Description of Deposit Source |
|---|---|
| $320,000 | Electronic payroll deposits from "Coffey Family Me," which routinely exceeded $10,000 per deposit |
| $15,000 | Checks payable to Brandon Coffey from CFMC Account xxx777 at First National Bank |

| | |
|---|---|
| $9,000 | Checks payable to Brandon Coffey from CFMC Account xxx840 at Regions Bank as referenced in paragraph 50 and 51 above |
| $750,000 | Checks payable to Brandon Coffey from Life Choices Wellness Clinic account xxx687 at First National Bank of Oneida |

Monthly deposits of checks from Life Choices Wellness Clinic, the Suboxone clinic run by Brandon and Alex Coffey described above, began in August 2014 with a $2,000 deposit. These monthly deposits continued through December 2017 (the end of the review period) and increased to more than $30,000 in a single deposit.  Additionally, the records identified the following expenses which indicate the purchase of assets:

| Check Number | Check Date | Check Payee | Check Amount |
|---|---|---|---|
| 2674 | March 31, 2017 | Realty Executives | $15,000.00 |
| 2675 | March 31, 2017 | Darryl Haynes *Memo: basement @ Mallard | $27,500.00 |
| 2886 | April 15, 2017 | Anderson Marine | $13,100.00 |

63.    A federal seizure warrant was served on Citizens First Bank account xxx535 in June 2018 and $48,913.46 was seized from this account.

64.    In June 2018, law enforcement executed a search warrant at Mark's Family Pharmacy. During the search, law enforcement interviewed the pharmacist-in-charge, Mark Byrd. Byrd identified the accounts into which Mark's Family Pharmacy deposits payments from patients who fill prescriptions at the pharmacy, including prescriptions from CFMC. Mark's Family Pharmacy has separate accounts for deposits from credit-card payments and for deposits of other types of payments, such as cash or checks. The two accounts are: Citizens First Bank account number xxx813 in the name of Marks Family Pharmacy LLC Credit Card Account; and Citizens First Bank account number

xxx355 in the name of Marks Family Pharmacy LLC.

65.     Financial records obtained in this investigation show that Bruce Coffey received in excess of $1.2 million from Mark's Family Pharmacy during the period of 2012-2017. In addition, Mark's Family Pharmacy is the co-beneficiary of a $750,000 life insurance policy on Bruce Coffey, which was issued in September 2015.

66.     This investigation has established that (1) Mark's Family Pharmacy has dispensed controlled substances to individual patients and groups of patients who travel long distances to see a doctor, (2) Mark Byrd has ignored his responsibility as a licensed pharmacist to ensure the validity of prescriptions for controlled substances thereby engaging in illegal distribution, and (3) there are strong financial incentives for Bruce Coffey and Mark Byrd to prescribe and dispense controlled substances to as many patients as possible.

67.     DEA reviewed a sample of more than 70 CFMC prescriptions for alprazolam, lorazepam, hydrocodone, and oxycodone (some, but not all, of the controlled substances commonly prescribed by CFMC) that Mark's Family Pharmacy filled from 2012 to 2018 and noted the prices indicated on the prescriptions. Using the lowest price for every drug strength in the sample and counting only prescriptions in the name of Bruce Coffey reported by Mark's Family Pharmacy in the Tennessee PMP records, DEA estimated a minimum revenue from this limited universe of more than $650,000. This figure increases if prescriptions from other CFMC practitioners are included in the count, or if the average prices from the sample are used instead of the lowest prices.

68.     Federal seizure warrants were served on Citizens First Bank accounts xxx813 and xxx355 in the name of Mark's Family Pharmacy. $37,008.97 and $2,328.37 was seized from account xxx813 and $164,567.04 and $25,960.93 was seized from account xxx355.

69.     Upon execution of a search warrant at Life Choices, Jessica Chambers was interviewed. She is a licensed practical nurse who has been employed at Life Choices since 2014. Chambers told law enforcement that payments from patients at Life Choices are regularly deposited into First National Bank account xxx687 in the name of Drs Coffey LLC Life Choices Wellness Clinic. Inside the clinic, law enforcement found multiple deposit tickets for this account going back to at least as early as 2015, and the deposit tickets showed that most of the deposits were in cash.

70.     A federal seizure warrant was served on First National Bank account xxx687 in June 2018 and $48,191.16 and $795.16 was seized from this account.

71.     According to records maintained by the State of Tennessee, on February 24, 2017, Bruce and Charlsey Coffey purchased a 2014 Mercedes-Benz GL450 from CarMax in Knoxville, Tennessee for $50,857.61. Bruce and Charlsey traded in a 2014 Infiniti ZX60 and paid the balance due of $17,857.61. As mentioned in paragraph 54, a check was written from their Citizens First Bank account xxx378 on February 24, 2017, to Carmax for $16,478.26 with a notation in the memo line of "Charlsey's Car."

72.     Law enforcement seized a 2014 Mercedes Benz GL450 with VIN 4JGDF7CE4EA286609 pursuant to a federal seizure warrant in June 2018.

73.     While executing a search warrant at the residence of David Bruce Coffey

in June 2018, law enforcement saw a 2014 Mercedes Benz GL450 with VIN 4JGDF7CE6EA306150, registered to David B. Coffey and Charlsey R. Coffey, parked in the attached garage. The vehicle was unlocked. Law enforcement located in the glove box of the vehicle a document on CarMax letterhead consistent with a sales contract for the Mercedes GL450. This document indicated that the Mercedes GL450 was purchased on January 21, 2017, from CarMax with a payment of $57,599.84.

74.     On February 15, 2017, cashier's check 127361 was issued from Citizens First Bank account number xxx378 in the amount of $58,000.00 with the notation "Cashier's Check for Mercedes GL450."

75.     Law enforcement seized the 2014 Mercedes Benz GL450 with VIN 4JGDF7CE6EA306150 pursuant to a federal search warrant in June 2018.

76.     While executing a search warrant at the residence of David Bruce Coffey in June 2018, law enforcement discovered and seized $9,150.00 in United States Currency.

77.     While executing a search warrant at CFMC in June 2018, law enforcement discovered and seized $40,396.75 in United States Currency.

78.     As described above, "patient funds" were deposited into the Coffey Family Medical Clinic account ending xxx449 at Citizens First Bank.  Portions of the funds from this account were deposited into the Coffey Family Medical Clinic at Regions Bank and Bruce's and Brandon's personal checking accounts at Citizens First Bank and Regions Bank. In total, the records I have reviewed to date indicate that the Coffey family received more than $2,700,000 directly from the Coffey Family Medical Clinic

account at Citizens First Bank.

## BASIS FOR FORFEITURE

79.     As explained above, the government's investigation has shown that CFMC

did not operate as a legitimate medical facility from at least 2012 until June 2018.

Instead, CFMC, Coffey, and their affiliates have repeatedly issued controlled substance

prescriptions outside the course of professional practice and not for a legitimate

prescription. Accordingly, I respectfully submit that there is probable cause to believe

that CFMC's and Coffey's earnings during the time period under investigation are

subject to forfeiture as outlined below.

80.     Investigators have traced the proceeds of CFMC's and Coffey's unlawful

activity to a number of financial accounts and assets. Investigators have identified and

analyzed the principal accounts used by CFMC and Coffey during the time period under

investigation and a number of additional accounts connected to the criminal activity.

81.     Based on the information developed during this investigation and set out in

this Affidavit, I have probable cause to believe that the defendant properties were

furnished or intended to be furnished in exchange for controlled substances, are proceeds

traceable to such exchanges, or were used or intended to be used to facilitate the illegal

sale of narcotics, all in violation of 21 U.S.C. §§ 841 and 846, and are therefore

forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6).

82.     In addition, I have probable cause to believe that the defendant properties

represent proceeds of drug trafficking and were involved in financial transactions with

the intent to promote drug trafficking and transactions which were designed to conceal

and disguise the nature, source, and true ownership of the funds in violation of the money laundering provisions of 18 U.S.C. §§ 1956 and 1957, and are therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a).

## CONCLUSION

83.    Based on the information provided in this Affidavit, there is probable cause to believe that Bruce Coffey, Brandon Coffey, and other practitioners at CFMC have engaged in the large-scale diversion of controlled substances by issuing prescriptions outside the scope of professional practice and not for a legitimate medical purpose, as well as laundered the proceeds of that drug trafficking.

I declare under penalty of perjury, as provided by federal law, that the foregoing statements are true.

Further, your affiant sayeth naught, on this the 23rd day of December 2019.


_Shawn W. Rogers_
Shawn W. Rogers, Special Agent
Drug Enforcement Administration